[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Attorney Kathleen Harkins, rep. mother
Attorney William Bingham, rep. children
Attorney Diane Whitney, A/AG
MEMORANDUM OF DECISION ON PETITION FOR TERMINATION OF PARENTAL RIGHTS
On March 8, 1989, the Commissioner of the Department of Children and Youth Services (hereinafter "DCYS") filed in this Court three separate petitions seeking that the parental rights of the respondent mother be terminated regarding Jason M., Tyrone M., and Justin M. On January 5, 1989, DCYS filed in this Court a co-terminous petition alleging grounds for commitment to DCYS and termination of parental rights of the respondent regarding Romance M.
The petition for termination regarding Jason M., Tyrone M. and Justin M. are each based on Connecticut General Statutes Section 17-43a(b)(2) and (3).
Section 17-43a(b)(2) provides as follows:
 ". . .the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the CT Page 6348 child. . ."
Section 17-43a(b)(3) provides as follows:
 "The child has been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well being. . ."
The statutory authority to petition for termination of parental rights is Section 17-43a(a).
The statutory authority to terminate parental rights is Section 17-43a(b), which provides as follows:
 "The superior court upon hearing and notice. . .may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that, with respect to any non-consenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year."
The question of termination of parental rights was recently discussed in the case of In Re Jessica M., 217 Conn. 459
(1991), where the court, at pages 464, 465, and 466, stated in part as follows:
 Although the severance of the parent -child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551
(1972); see also In Re Juvenile Appeal (83-CD), 189 Conn. 276, 295, 455 A.2d 1313
(1983) (noting that "it is both a fundamental right and the policy of this state to maintain the integrity of the family"). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. "The fundamental liberty interest CT Page 6349 of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). . . .
 As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination. In re Barbara J., 215 Conn. 31, 45, 574 A.2d 203 (1990); In re Luis C., 210 Conn. 157, 165, 554 A.2d 722 (1989); In re Juvenile Appeal (Anonymous, supra, 177 Conn. 771-72; see also O. Ketcham and R. Babcock, "Statutory Standards for the Involuntary Termination of Parental Rights," 29 Rutgers L. Rev. 530, 539 (1976). We have observed, however, that "(i)nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child." In re Juvenile Appeal (Anonymous), supra, 177 Conn. 672. A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship. Santosky v. Kramer, supra, 760.
The three petitions for termination of parental rights regarding Jason M., Tyrone M. and Justin M. will first be addressed and the co-terminous petition regarding Romance M. will be addressed later in this decision.
I. PROCEDURAL BACKGROUND
The respondent is the mother of Jason, age 10; Tyrone, age 6; and Justin, age 5. No legally recognized father has been identified for any of the boys. The respondent has always resided in the Norwich/New London area. She graduated CT Page 6350 from high school and attended Mohegan Community College for a period of time.
On April 21, 1985, respondent initiated a self referral to DCYS and requested placement of her children, Jason and Tyrone. The children were returned to respondent's care on July 10, 1985, resulting in placement of the children for a period of 78 days. During that intervening period, respondent sought medical and psychological services at Lawrence Memorial Hospital. Following the return of her children, respondent attended Alcoholics Anonymous and a Lawrence Memorial outpatient program and obtained the services of a parent aid.
In March of 1986, respondent initiated a second self referral which resulted in the placement of her children for a period of 43 days, after which the children were returned to her care. During that intervening time frame, respondent sought medical and psychological assistance at Norwich Hospital, and following the children's return, continued to attend Alcoholics Anonymous, met with a psychiatric nurse with the Visiting Nurses Association and attended the Lawrence Memorial outpatient program.
Jason, Tyrone and Justin were found to be neglected and uncared for on December 1, 1987.
 II. BURDEN OF PROOF AND PROCEDURE TO FOLLOW
In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition by clear and convincing evidence. In re Theresa S., 196 Conn. 18
(1985). If the petitioner meets this burden, the Court must then decide whether termination of parental rights is in the best interest of the child, and in doing so, the Court must consider and make findings in writing of the six factors set out in Connecticut General Statutes Section 17-43a(d). If the Court decides it is in the best interest of the child to terminate parental rights, the petition should be granted and the petitioner appointed the statutory parent of the child.
The Court does not consider the "child's best interest" unless grounds for termination have been proven by clear and convincing evidence.
The adjudication on the petition may consider facts as of the last day of filing or amending the petition, which in each instance regarding Jason, Tyrone and Justin was March 20, 1990. In deciding the disposition, the Court may consider CT Page 6351 facts as of the last date of trial including those facts contained in the mandatory social study. In re Juvenile Appeal, 192 Conn. 254 (1984).
 III. THE PETITIONER'S CLAIM THAT THE RESPONDENT HAS FAILED TO REHABILITATE HERSELF IN ACCORDANCE WITH SECTION 17-43a(b)(2)
Jason, Tyrone and Justin were most recently placed in foster care by their mother in May 1987, and were all found by the court to be neglected and uncared for on December 1, 1987. They were committed to the petitioner's custody on that date and the commitments were extended by agreement on April 11, 1989, effective June 1, 1989.
Personal rehabilitation has been interpreted by the Connecticut Appellate Court as ". . .the restoration of a parent to his or her former constructive and useful role as a parent." In Re Migdalia M., 6 Conn. Appl 194, 203,504 A.2d 533 (1986), cert. denied 199 Conn. 809, 508 A.2d 770. It requires proof by DCYS that ". . .the parents of a neglected or uncared for child have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, . considering the age and needs of the child, they could assume a responsible position in their child's life." In Re Rayna M., 13 Conn. App. 232, 32 (1987). In Re Luis C., 210 Conn. 157, 167 (1989). The statute requires the court to analyze the level of the parent's rehabilitation as it relates to the particular child. In Re Luis C.,210 Conn. 157, 167 (1989). The reasonableness of the time period is a question of fact. In Re Davon M., 16 Conn. App. 693,695-6 (1988).
The Court finds the following additional facts. The respondent is an alcoholic and began abusing alcohol when she was 14 years old. Her continuing problem with alcohol has caused her to be admitted to several detoxification programs. The various treatment plans, social studies, and expectations between DCYS and the respondent reveal the following. The treatment plan of March 25, 1986 shows that the respondent was involved with AA and was seeing Richard Bennink at the Lawrence Memorial Hospital Psychiatric Outpatient. She was also involved with her church. DCYS felt that her church involvement could be a problem due to her feelings of guilt about the illegitimate births of her children and other events in her life. While DCYS, in its treatment plan of March 25, 1986, felt that the respondent's involvement with her church could be a problem, it is also true that the various expert doctors who examined and treated her all felt that her church involvement was a positive trait in her favor. The treatment CT Page 6352 plan of May 5, 1987 was designed to assure that by the utilization of DCYS treatment worker and the provision of Community Services that the respondent's life would be destressed to the point that she would be able to appropriately care for her three young children in her own home. The service agreement of June 2, 1987, which was to last for a duration of six months, had as its goal the reunification of Jason, Tyrone and Justin with their mother and had as its objective the children to be maintained in a safe, nurturing environment. The treatment plan dated November 1, 1987 had as its goal through treatment intervention to assist the respondent and being able to regain the care of her children. The expectations were that the respondent would stabilize her lifestyle and find alternate means of dealing with the stresses of her life to the point where she could adequately care for her children. The supplemental social study dated January 7, 1988 shows that the respondent was calling her children at least three times weekly and her visits to the children had averaged at least every two weeks. It further shows that the respondent accompanied Justin's foster mother for Justin's neuro-seizure evaluation on December 31, 1987 at the University of Connecticut Neuro-Seizure Clinic in Farmington. The service agreement dated December 28, 1987 and January 13, 1988 had as its goal to return Jason, Tyrone and Justin home and as its purpose for the respondent to engage in treatment in order to provide a safe, nurturing environment for her children. The treatment plan dated May 1, 1988 shows that she had stopped taking her medication and attending counseling sessions against her doctor's orders. It further shows that the respondent attends AA weekly in New London and receives SSI and Title XIX and has maintained her apartment. It further shows that she visits her children weekly at the foster parents and calls them frequently during the week and tries to stay involved with their school needs and medical care. Further, her involvement with drug users and abusive relationships may have lessened and her relationship with the foster mothers was beginning to improve. The goal was through treatment intervention to assist the respondent in being able to regain the care of her children and the expectations were that she would stabilize her lifestyle and find adequate means of dealing with the stresses of her life to the point where she could adequately care for her children. The treatment plan on November 1, 1988 shows that the respondent keeps in very close contact with her children and takes all three children to family therapy two times a month and sees Dr. Connelly every Friday. In addition to counseling, the respondent was also taking Jason and Tyrone to her apartment every Saturday and has Justin one other day during the week. Her attendance and progress in counseling have both been improving as has her relationship with both CT Page 6353 foster mothers. The goal was to provide the respondent with an opportunity to adjust to having her children around in phases and to allow full-day, unsupervised visits and work up to overnights until their return home. The federal case plan requirements were that family counseling would help minimize problems in the home and lead to a smooth reunification of this family and placement and regular home visits would enable mother to learn how to cope with the four children in the home.
The Court has had the benefit in this case of testimony from Robert D. Meier, Ph.D, Michael A. Nelken, M.D., Willie J. Colman, Ph.D., and James J. Connelly, Ph.D. This Court accepts as factual the conclusions and recommendations of Dr. Meier in his report of July 12, 1989 as follows:
Conclusions and Recommendations:
 1. Gail M. continues to show signs of emotional distress. Periods of emotional problems are interspersed with periods of relative stability. She seems to deteriorate under stress and has a difficult time keeping in consistent and stabilized pattern of behavior. She seems to genuinely care about her children, but has difficulty following through with respect to basic needs. Alcohol or substance abuse appears to be a strong contributing factor to her periodic deterioration.
 2. When her behavior deteriorates there are indications that she continues to have auditory hallucinations, or possible delusions at times and has difficulty separating reality from fantasy. There currently are signs of some difficulty with organizing and intergrating her thought process. Her statements regarding substance abuse especially alcohol are inconsistent. She admitted to drinking, but said that she does not drink "seriously". There appears to be a continued need for therapy as well as treatment of alcohol abuse. She attends "AA" periodically.
 3. Gail M. continues to avoid discussing her problems related to social CT Page 6354 interactions and relationships. She stated that she has not discussed these fully with either the therapist or with anyone else. However, the therapist did seem to have significant awareness of the relationship with another woman. Difficulties in this relationship or relationships have most likely led to her being physically assaulted. As long as she is engaged in such an abusive relationships (sic) the welfare and safety of the children cannot be insured.
 4. At the present time, because of her emotional difficulties, her involvement in rather violent relationships, and her history of substance abuse which she has not fully addressed, it cannot be recommended that these children be returned to her care at this time. At the time of the last evaluation it was recommended that a specific service agreement be established and that her compliance with such an agreement be carefully monitored. The results of that agreement should be reviewed to determine whether she has been able to follow through on her responsibilities.
 5. It is expected that Gail M. will continue to show periods of relative stability followed by significant deterioration of the kind leading to placement of her children. The children are likely to experience disruption in their care and environment over the next several years. The prognosis for mother is very guarded with respect to any significant changes within the next two to three years, although periods of stability may be present.
Dr. Colman, in his psychological evaluation report following his evaluations of December 7 and December 9, 1987 concludes with the following summary and conclusions:
 (Respondent) has shown very definite improvement since I first saw her in October and November. Nevertheless, she is still emotionally unable to be an CT Page 6355 effective parent of her children. She needs to receive mental health treatment (including medication) and addiction services before the return of her children can be meaningfully considered. Unfortunately, her desire for the return . of her children has yet to be enough to get her to make a sincere effort at getting help.
Dr. Michael A. Nelkin, on the other hand, in his report of July 24, 1989, regarding medication, reached the conclusion that with regard to medications, the Court may be given to understand that no indication for chemical treatment of this patient currently exists. Her condition is such that the possibility of help from any drugs currently available is less than the possibility of harm, particularly in light of her inclination towards substance abuse and non-cooperation with treatment programs.
Finally, the mistake, with the benefit of hindsight, was the recommendation of Dr. Connolly in his report of November 25, 1988, that in his opinion, it would be appropriate to begin to allow the respondent to have overnight visitation with her children.
Against the above background, the Court is called upon to determine whether the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of each child, whether the respondent could assume a responsible position in the life of each child.
The Court makes the following additional findings.
(1) The respondent's alcohol addiction problem is severe and it impairs her ability to parent her children and exacerbates her psychiatric problems. Her pattern is to experience a crisis, to stabilize rather quickly, but to be unable to maintain that stability. It is likely that her pattern in the future would continue to be that of experiencing a crisis, stabilizing rather quickly, but being unable to maintain that stability. Her psychiatric problems have been variously diagnosed as borderline personality disorder, paranoid, psychotic, with schizotypal traits, and anti-social personality disorder. Her disturbance and auditory hallucinations that she experienced in the past have stopped. Her tendency to enter into abusive relationships has also stopped. Rehabilitation, if successful, would take a period in excess of one year. It is unlikely that she could care for her CT Page 6356 children in the next several years. Her general psychological state in 1988 and 1989 were probably healthier than her psychological state in previous years. In the event she could remain substance free for a year then the likelihood that she would be significantly more emotionally stable is great and that could be a turning point. As stated by Dr. Connolly, rehabilitation for the respondent would require the following:
 "My recommendations would be that she needs something more intensive than a conventional outpatient psychotherapy which was what I was providing for her, but probably less intensive than a long term inpatient hospitalization. I believe that a more than once a week contact with a day treatment substance abuse program which had access to urinalysis, and confrontive therapy involving individual and group modalities should be part of her treatment under ideal circumstances. I believe that she should also be under, in addition to that, that she should be under the care on at least a weekly basis of a psychologist or psychiatric social worker to deal specifically with the personality disorder issues, and that these two components of her treatment, the fairly intensive substance abuse treatment and the treatment of her personality disorder should be closely coordinated. They would not necessarily have to be provided by the same agency, but the treatment of the two should be closely coordinated. There should be very open communication between the two of them. In addition, I believe that both of those components of her treatment should be in very close contact with the Department of Children and Youth Services so that the basic components of the treatment plan generated by these two cooperating therapeutic components could be monitored and enforced by DCYS. That's what I would suggest ideally."
The Court makes the following additional findings regarding the age and needs of Jason, Tyrone, and Justin.
(A) Jason was born February 15, 1981. He is consistently falling in the low average range of mental ability. He was particular difficulties with spelling and CT Page 6357 reading. There is a strong possibility of a learning disability in his case. He is aware of some of the problems being experienced by his mother and shows some confusion about being placed in foster care. He is concerned about his mother's problems and the fact that she was drinking heavily at times. He is concerned in the sense of who his primary caretaker would be and where he would grow up and in whose home. He has fear of being hurt.
(B) Tyrone was born October 18, 1984. Tyrone is in the same foster home as Jason. He is much more quiet than Jason. He has difficulty expressing his feelings and reactions. His problem with speech delay has improved. He does not express his feelings very openly. He is getting involved in conflicts with other children at school including fights, kicking other children, and is showing a lot of aggressiveness towards other children. He is showing some indication of underlying distress.
(C) Justin was born November 1, 1985. He shows some indication of possibly having some developmental delays. He scores in the borderline to low average range of ability. He is also scoring below average with motor development. He also shows speech delays. He does not understand or comprehend what is happening in terms of his being placed and in terms of his not being with his mother.
The Court finds that DCYS has proven by clear and convincing evidence the following: (1) Jason, Tyrone, and Justin were found to be neglected and uncared for on December 1, 1987; (2) the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of each child, that she could assume a reasonable position in the life of such child.
 IV. THE RESPONDENT'S CLAIM THAT EACH CHILD HAS BEEN DENIED BY REASON OF AN ACT OR ACTS OF PARENTAL COMMISSION OR OMISSION, THE CARE GUIDANCE, OR CONTROL NECESSARY FOR HIS PHYSICAL, EDUCATIONAL, MORAL OR EMOTIONAL WELL BEING
In support of this claim, the petitioner argues in part as follows:
 All the facts discussed above regarding failure to rehabilitate are also relevant to this ground. Ms. Murphy lost custody of the children because she was unable to care for them, and she was CT Page 6358 unable to care for them because of her alcohol dependence and psychiatric problems. The repeated, long-term foster care placements, which have never been challenged by (the respondent) mean that the children have been out of her control for a long time. She has not provided them with care, guidance, and control for three years, in the case of the older boys, and since Romance was one month old.
 (The respondent) lost custody of Romance on December 2, 1988, when she was inebriated and threw the poorly clad three week old infant to a thirteen year old child. After being taken to her apartment by Cynthia Lanier that night, she took off most of her clothes and passed out on the floor. All the children were there at the time. John Mercier, (the respondent's) earlier social worker, testified that the incident with Romance mirrored an incident years earlier with Jason when he was a baby. DCYS believed that both incidents put the babies in danger.
 (The respondent's) acts of omission and commission may be described in total as a failure to act as the boys' mother. Her heavy drinking is obviously an act of commission well documented, serious and admitted. Because of it she has failed to give her children the care and control they need.
The Court is not persuaded by that argument.
The children have remained in placement since the respondent voluntarily requested placement of the children on May 1, 1987. Counsel was not appointed to represent her until October 14, 1987. Psychological evaluations to assist in determining what services should be implemented on behalf of the respondent and her children were not concluded until November of 1987. The fact that the respondent saw fit to attempt to work with DCYS towards the return of her children cannot be characterized as a failure to challenge the foster care placement. There is no clear and convincing evidence that the respondent failed to provide the proper care, guidance or control necessary for the physical, educational, moral or emotional well being of her children during the periods of CT Page 6359 time that they were with her.
The Court concludes that DCYS has failed to prove this grounds by clear and convincing evidence.
V. THE SIX FACTORS OF SECTION 17-43a(d)
Section 17-43a(d) requires that the Court consider and make written findings regarding:
(1) The timeliness, nature and extent of services offered or provided to the parent and the child by the agency to facilitate the reunion of the child with the parent.
The Court finds the following facts regarding this factor.
DCYS provided mother with the phone numbers and information as to who to contact regarding parent aid services, visiting nurse services, placement of the children when requested by mother, and placement of the children in close proximity to mother. On a limited number of occasions, DCYS transported mother to emergency rooms and to visit the children. DCYS urged mother to attend counseling and support groups and once provided money for mother for transportation to visit the children. DCYS also arranged for evaluations of mother and the children. DCYS also provided mother with a referral to SCADD. DCYS also encouraged mother to apply for a Title XIX medical card and informed her of support group services at the Women's Center.
(2) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The Court finds the following facts regarding this factor.
As stated by DCYS in its brief, the only court order which appears to have been entered into in this matter was entered into in December 1988 or early 1989 and was that the respondent not drink prior to or during her visits with the children. The Court finds from the testimony presented that the respondent violated that order several occasions out of a total of approximately 109 separate dates on which the respondent visited with one or more of her four children between January 8th, 1988 and August 19, 1989, as well as continued visits approximately weekly thereafter. CT Page 6360
(3) Feelings and emotional ties of the child with respect to his parent, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
The Court finds the following facts regarding this factor.
(A) Jason
Jason has been living with Mattie Lanier, his foster parent, since July 30, 1987. Jason has the best understanding of his mother's problems. His mother is his psychological parent, but he feels conflicted about his relationship with her. He does not ask to return to live with her, but he does ask where he will live in the future. Jason has special needs and special fears. Jason refers to his foster mother as "grandma." He has a close extended family relationship with all of the relatives in that house. Jason calls the respondent "mommy" or "mother." The respondent has a strong affection for Jason and an interest in observing him and guiding him. Jason is responsive to her and regards her as an authority figure and someone to whom he could appeal his case when he had any disagreement. Mother's interaction with Jason is very appropriate. Mother is emotionally tied to Jason and loves him.
(B) Tyrone
Tyrone is less verbal than Jason. Tyrone refers to his foster parent as "grandma." He has a close extended family relationship with all of the relatives there. Tyrone refers to the respondent as "mother" or "mommy." The respondent has an interest in continuing a parental relationship with Tyrone. She has a strong affection for Tyrone and has an interest in observing him and guiding him. Tyrone is responsive to her and regards her as an authority figure and someone to whom he could appeal his case when he had a disagreement. Tyrone has been living with Mattie Lanier, his foster parent, since July 30, 1987.
(C) Justin
Justin who was born November 1, 1985, has been living with Mrs. Shambley since July 30, 1987. He refers to her "grandma" or "mommy." He also refers to the respondent as "mommy." The respondent has a strong affection for Justin and an interest in observing him and guiding him. Justin is responsive to her and regards her as an authority figure and CT Page 6361 someone to whom he could appeal his case when he had a disagreement. He regards his foster mother as his psychological parent.
(4) The Ages Of The Children;
Jason was born February 15, 1981. Tyrone was born October 18, 1984. Justin was born November 1, 1985.
(5) The Efforts The Respondent Has Made to Adjust Her Circumstances, Conduct or Conditions to Make it in the Best Interest of the Child to Return Him to Her Home in the Foreseeable Future, Including But Not Limited to (A) the Extent to Which the Parent has Maintained Contact With the Child as Part of an effort to Reunite the Child With the Parent, Provided the Court May Give Weight to Incidental Visitations, Communications or Contributions and (B) The Maintenance of the Regular Contact or Communication with the Guardian or other Guardian of the Child
The Court finds the following facts regarding this factor.
The respondent has maintained contact with each of the three children on a consistent basis. Between January 1, 1988 and August 9, 1989, she visited Jason approximately 61 times, Tyrone approximately 63 times and Justin approximately 65 times. Almost all of the visits with Jason and Tyrone were simultaneous. Since August 9, 1989, she has visited each of the three children approximately once a week. She has involved herself in Jason's attention deficit disorder problem. She also involved herself in Jason's ringworm condition. She attended medical appointments for Jason at the Newington Children's Hospital.
The primary underlying circumstance involving the respondent is her addiction to alcohol. She has abused alcohol since the age of 14 until the present time. In addition, she has also used illegal drugs. All attempts to maintain herself alcohol free for any extended period of time have not been successful. She presently has part-time employment. The home that she had resided in for five years had to be vacated by her as her apartment was only affordable due to Section 8 subsidies, and since her children are in foster care, she could not continue to qualify for Section 8 subsidies. Any meaningful effort to address her alcohol addiction problem would require her to attain sobriety for at least a one-year period. She has not maintained sobriety for that period of CT Page 6362 time as of the completion of trial.
Her prognosis for successful rehabilitation is poor. The steps that the respondent has taken to treat her alcohol abuse have not been sufficient. There is still a significant denial of the seriousness of the alcohol problem by her. She has been aware of her alcohol problem for a number of years, but has not made the commitment to follow through with a successful program to treat it.
(6) The Extent to Which a Parent has Been Prevented from Maintaining a Meaningful Relationship with the Child by the Unreasonable Act or Conduct of the other Parent of the Child or the Unreasonable Act of Any Other Person or By the Economic Circumstances of the Parent
The Court finds the following facts regarding this factor.
Mother was not prevented from developing a more meaningful relationship by any unreasonable act of DCYS but rather was encouraged to maintain such a relationship.
Until December 2, 1988, reunification of mother with her three oldest children appeared to be a common goal of both mother and DCYS. Following her arrest on December 2, 1988, in an incident involving Romance, DCYS determined that reunification was no longer their goal. Following the removal of Romance from her custody, the respondent had an overall mood of depression and despair. The respondent claims that the tension between her and Mrs. Lanier (the foster mother of Jason and Tyrone) had an adverse effect on her ability to have a meaningful visitation relationship with Jason and Tyrone. The court rejects that contention. The Court finds that there was no unreasonable act on the part of any of the foster parents or on the part of DCYS that prevented the respondent from maintaining a meaningful relationship with any of her children. The Court further finds that the economic circumstances of the respondent did not prevent her from maintaining a meaningful relationship with any of her children. Further, there were no unreasonable acts by the foster mother of Jason and Tyrone or by the foster mother of Justin, that prevented the respondent from maintaining a meaningful relationship with those three children.
The Court has considered all of the factors contained in Connecticut General Statutes Section 17-43a(d) and concludes that it is in the best interest of Jason, Tyrone and Justin to terminate the parental rights of the respondent CT Page 6363 mother.
 VI. THE PETITIONER'S CLAIM THAT ROMANCE SHOULD BE FOUND TO BE NEGLECTED AND UNCARED FOR
The petitioner has filed a petition alleging that Romance is neglected and uncared for, which petition is file stamped January 5, 1989. Romance was born November 11, 1988. The petitioner alleges that Romance has been denied proper care and attention physically and emotionally and was allowed to live under conditions, circumstances or associations injurious to his well being. The petition seeks the commitment of Romance to the custody of DCYS for a period not to exceed eighteen months. The statutory authority for this petition is Connecticut General Statutes Section 46b-120. The Court has considered the mother's history of hospitalization and psychiatric problems, her history of alcohol abuse, the previous commitments of Romance's three brothers, and the incident on December 2, 1988, when mother was intoxicated and placed Romance at risk of injury. That incident occurred when mother threw Romance, who was not adequately dressed for the cold weather, to a 13-year-old child. After being returned to her apartment that evening, the respondent removed most of her clothing and passed out on the floor. All four of her children were present at the time.
A co-terminous petition is permitted to be filed under Connecticut General Statutes Section 17-43a(e). In dealing with a neglect petition, the Court views the evidence from a fair preponderance of the evidence standard.
The Court concludes that DCYS has proven by a fair preponderance of the evidence based on facts existing on the date the petition was filed that Romance was neglected and uncared for on that date.
DCYS seeks a waiver of the requirement that the grounds for termination of parental rights shall have existed for not less than one year as required by Section 17-43a(b).
The Court finds the following additional facts regarding the waiver issue. Romance was born November 11, 1988. He remained in the care and custody of the respondent until the December 2, 1988 incident. Prior to the December 2, 1988 incident, DCYS did not have any plans to intervene insofar as Romance remaining in the care and custody of the respondent. Shortly after Romance was born, DCYS met with the respondent for a treatment plan review. This meeting took place on November 21, 1988. The respondent brought Romance with her to the DCYS office for the treatment plan review. CT Page 6364 Romance was dressed appropriately at that time for the cold weather.
The Court has considered all of the facts involving this case, both as they relate to Romance as well as they relate to his three siblings as found in this memorandum of decision. The Court has also considered the reports of Dr. Willy J. Coleman, including his report on January 11, 1988, in which the reason for the referral to him by DCYS was to evaluate the current ability to adequately parent her children to help determine whether the children should be committed to DCYS. The Court has also considered the report of Dr. Robert D. Meier, file stamped March 31, 1989 (almost three months after the petition for termination regarding Romance was filed). That evaluation was requested by DCYS in order to assist with decisions regarding Romance. Recommendations numbers 4 and 5 in that report were as follows:
 4. Since this evaluation was directed to address only her behavior with respect to Romance, her ability to care for this child has only been assessed during a limited period of time. It is therefore recommended that a service agreement be established with Gail M., spelling out clearly her responsibilities in terms of visiting the child, gaining greater responsibility for the care of the child, following through with alcohol and substance abuse treatment, and continuing in psychotherapy for a period of at least six months. If at the end of that time she has shown an inability to rehabilitate herself, it is recommended that consideration be given to placing Romance in a permanent home other than that of Gail M.
 5. It is recommended that a psychiatric consult be scheduled for Gail M. in order to assess the appropriateness of medication. If such a treatment is recommended, this should also be addressed by the service agreement.
Notwithstanding that report, DCYS did not withdraw the termination petition in this case. The Court finds further from the evidence presented that mother's ongoing progress of rehabilitation as shown in the DCYS treatment plans of May 1, 1988 and November 1, 1988 deteriorated following the filing of CT Page 6365 the termination of parental rights petitions in this case. Connecticut General Statutes Section 17-43a(c) empowers the Court to "waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child." The Court finds from the totality of the circumstances in this case surrounding Romance that such a waiver is not necessary to promote the best interest of the child. therefore, the Court will not reach the grounds alleged in the termination of parental rights petition regarding Romance.
The request of DCYS to waive the one-year requirement is denied.
ORDER
(1) Each petition for termination of parental rights of the respondent mother in and to Jason M., Tyrone M., and Justin M. is ordered granted.
(2) The Commissioner of DCYS is appointed statutory parent so that Jason, Tyrone, and Justin may be placed in adoption.
(3) DCYS is ordered to submit reports to the Clerk of the Court within ninety days from the date of this judgment.
(4) The petition seeking the commitment of Romance to the custody of DCYS for a period not to exceed eighteen months is ordered granted.
(5) DCYS is ordered to submit a report to the Clerk of the Court within ninety days from the date of this judgment regarding Romance.
AXELROD, J.